[Civ. No. 8107. Third Dist. July 16, 1952.]

DOROTHY S. DUPUY, Appellant, v. CHARLES J. McCOLGAN, as Franchise Tax Commissioner, etc., Respondent.

Morrison, Hohfeld, Foerster, Shuman & Clark, Leon De Fremery, and Walter Slack for Appellant.

Edmund G. Brown, Attorney General, James E. Sabine and Ernest P. Goodman, Deputy Attorneys General, for Respondent.

SCHOTTKY, J. pro tem.—Eight actions were commenced against the State Franchise Tax Commissioner to obtain a refund of personal income taxes paid by plaintiffs under protest for the years 1935 and 1936. The eight actions were consolidated for trial and were tried on a stipulation of facts from which the court made findings and drew the following conclusions of law:

"I

"That the income received by Monarch Investment Company under the oil lease referred to in the findings of fact was income from royalties within the meaning of subdivision (1) of section 2(o) of the California Personal Income Tax Act of 1935. (Stats. 1935, ch. 329, p. 1090.)

"II

"That the Monarch Investment Company was a Personal Holding Company within the meaning of section 2(o) of the California Personal Income Tax Act of 1935.

"III

"That the income of Monarch Investment Company was properly includable in the incomes of all the plaintiffs in these actions under the provisions of section 34 of the Personal Income Tax Act of 1935."

A single judgment was entered in favor of defendant Franchise Tax Commissioner and plaintiffs have appealed.

Section 2(o) of the Personal Income Tax Act of 1935, so far as here relevant, provided:

"The words 'personal holding company' means any corporation (other than a corporation exempt from taxation under section 101 of the Federal Revenue Act of 1934, and other than a bank or trust company incorporated under the laws of the United States or of any State or Territory, a substantial part of whose business is the receipt of deposits, and other than a life insurance company or surety company) if

(1) at least eight per centum of its gross income for the taxable year is derived from royalties, dividends, interest, annuities, and (except in the case of regular dealers in stock or securities) gains from the sale of stock or securities, and (2) at any time during the last half of the taxable year more than fifty per centum in value of its outstanding stock is owned, directly or indirectly, by or for not more than five individuals.''

Section 34 of the Personal Income Tax Act of 1935 provided:

''For the purpose of this act a personal holding company whether or not organized under the laws of this State shall not be recognized as a legal entity separate and distinct from the shareholders thereof. Any such company having more than one shareholder shall be deemed a partnership.''

The portion of the act here involved provides that the income of personal holding companies is taxable ''if (1) at least eighty per centum of its gross income for the taxable year is derived from royalties.'' The sole question to be determined upon this appeal is whether the income from the oil lease was ''rent'' or ''royalty.'' If ''rent,'' it was not part of the income of a holding company; if ''royalty,'' it was. As expressed by appellant: ''The solution to the question as to whether Monarch was or was not a personal holding company depends upon whether payments received by Monarch under an oil lease constitute 'royalties' within the meaning of said section. If these payments were not 'royalties,' as the word was used in the section, Monarch was not a personal holding company and the decision should have been for the appellants.''

The lease here involved was executed on February 14, 1917, between Sunset Monarch Oil Company (the name of Monarch Investment Company prior to May 28, 1920) and the Standard Oil Company and reads that ''the Lessor has leased, let and demised and by these presents does lease, let and demise unto the Lessee . . . the land hereinafter described, with the sole and exclusive right to the Lessee to drill for, produce, extract and take oil, gas asphaltum and other hydrocarbon substances,'' etc.

The lease then provides:

''The Lessee shall pay to the Lessor as royalty and rent for said premises one-fifth (1/5) part of all oil, asphaltum or other hydrocarbon substances extracted and saved from said premises. For all gas produced and saved and sold off the premises by the Lessee, the Lessee shall pay as rent and royalty

one cent (1¢) per thousand (1000) cubic feet . . . . The Lessee shall not be required to account to the Lessor for or pay any rent or royalty on oil, gas or water produced by the Lessee from the premises and used by it in its operations hereunder, but may use such oil, gas and water free of charge.

"Other than the royalty gas, the Lessor's royalty shall be delivered to the Lessor on the part of the land where produced and saved, and, if taken in kind, such royalty shall be delivered as produced and saved into tanks maintained on the land for that purpose by the Lessee, . . . Should the Lessor elect from time to time to have the Lessee purchase such royalty, the Lessee, upon thirty (30) days' notice in writing of such election, hereby agrees to purchase, take and receive all of said rents or royalty, and shall pay therefor the current prices paid by the Lessee from time to time to producers for products of like character, gravity and quality, in the Sunset Oil Field, and such payments shall be made to the Lessor on the 15th day of each month, for all rent and royalty produced during the preceding calendar month.

"The rent and royalty aforesaid shall be ascertained, computed and paid monthly, . . . ."

The original term of the lease was 20 years, but by a supplemental agreement dated December 7, 1931, the term was increased to 30 years.

It is agreed by both appellant and respondent that the definition of a personal holding company contained in section 2(o) of the California Personal Income Tax Act of 1935 was taken verbatim from the Federal Revenue Act of 1934. In order to ascertain the meaning of "royalties" in section 2(o) we should consider the scope of the term "royalties" in the Federal Revenue Act of 1934.

Webster's New International Dictionary, second edition, defines the word "royalty" as ". . . 6. A right, prerogative, due, or perquisite belonging to a king or sovereign; as: a A seigniorage on gold and silver coined at the mint. b (1) *Eng. Law.* Any of the royal rights constituting the regalia (which see), including various rights in land, such as the right to all gold and silver mines, (called royal mines); hence, a percentage paid to the crown of gold or silver taken from mines, or a tax exacted in lieu of such share; an imperialty. (2) *Coal Mining. Eng.* A tract of coal-mining land, or a portion thereof. 7. Hence: a A share of the product or profit (as of a mine, forest, etc.) reserved by the owner for permitting another to use the property. b A duty or compensation paid to the owner

of a patent or a copyright for the use of it or the right to act under it, usually at a certain rate for each article manufactured, used, sold, or the like; also, a percentage, as an output, paid to the owner of an article, esp. a machine, by one who hires the use of it. . . ."

In Black's Law Dictionary, third edition, the word "royalty" is defined as:

"A payment reserved by the ·grantor of a patent, lease of a mine, or similar right, and payable proportionately to the use made of the right by the grantee. [Citations omitted.]

"Royalty also sometimes means a payment which is made to an author or composer by an assignee or licensee in respect of each copy of his work which is sold, or to an inventor in respect of each article sold under the patent."

It would appear from the foregoing definitions that the term "royalty" as referring to a share of the product or profit of a mine or of a forest is deeply rooted in English history, and that by common usage the payments of a share of the product under oil leases are referred to as "royalties." ▮ It is a general rule of statutory construction, as stated by the court in *Crane* v. *Commissioner of Internal Revenue*, 331 U.S. 1, 6 [67 S.Ct. 1047, 91 L.Ed. 1301], that "the words of statutes—including revenue acts—should be interpreted where possible in their ordinary, everyday senses" in the absence of a clear showing of legislative intent to give the words a special meaning.

It is agreed by both parties that the basic purpose of Congress in enacting provisions relating to personal holding companies was to impose a surtax on undistributed incomes of nonoperative family holding corporations or so-called "incorporated pocket-books," and that Congress intended to deter the avoidance of income tax through the formation of a family corporation to receive and hold income from investments.

Appellants contend that Congress regarded the right to receive a specified percentage of all oil and gas produced not as a royalty but as rent which was excluded from the definition of personal holding company income. Respondent in reply asserts that it is difficult to conceive how the objective of Congress would be furthered by the exclusion from the surtax provisions of income from oil and gas royalties, or why oil and gas royalties would be excluded while royalties from patents, copyrights, etc., along with interest, dividends

and annuities would be included in the definition of personal holding company income.

Respondent argues that prior to the enactment of the Revenue Act of 1934 Congress, the federal courts and the Treasury Department were familiar with the distinction between rents and royalties. He cites the statute enacted by Congress in 1920, empowering the Secretary of the Interior to grant oil leases on government lands, which act provided that:

"Such leases shall be for a term of twenty years upon a royalty of 5 per centum in amount or value of the production and the annual payment in advance of a rental of $1 per acre, the rental paid for any one year to be credited against the royalties as they accrue for that year, with the right of renewal as prescribed in section 17 hereof. The permittee shall also be entitled to a preference right to a lease for the remainder of the land in his prospecting permit at a royalty of not less than 12½ per centum in amount or value of the production."

Respondent points out also that in a number of federal income tax cases heard in the October, 1932, term of the United States Supreme Court, payments under oil and gas leases based on a percentage of production were regarded as "royalties." (*Palmer* v. *Bender,* 287 U.S. 551 [53 S.Ct. 225, 77 L.Ed. 489] ; *Murphy Oil Co.* v. *Burnet,* 287 U.S. 299 [53 S.Ct. 161, 77 L.Ed. 318] ; *Burnet* v. *Harmel,* 287 U.S. 103 [53 S.Ct. 74, 77 L.Ed. 199].) The Supreme Court also held in these cases that the holders of a royalty interest, i.e., a right to receive a specified percentage of all oil and gas produced during the term of the lease, are deemed to have an economic interest in the oil and gas subject to depletion and therefore are entitled to a depletion allowance under the federal income tax laws. On the other hand, recipients of rents are not entitled to any such depletion allowance.

An examination of the legislative history of the Federal Revenue Act of 1934 indicates quite strongly that Congress intended to include within the definition of holding company income all royalties except "overriding royalties" received by an operating company. As originally introduced in the House of Representatives the clause defining personal holding company contained the word "rent" in addition to "royalties, dividends, interest, annuities." But in the Senate the word "rent" was stricken from the enumeration of items of personal holding company income, the reason being, as expressed in the report of the Senate Finance Committee, "A

great part of real estate business is done by small family corporations. These partake more of the nature of operating companies than mere holding companies. Your committee is of the opinion that it is unwise to include such companies within the category of personal holding companies.'' It appears also that at hearings before the Senate Finance Committee an attempt was made to have the definition of personal holding companies changed so as to specifically exclude from the operation of these provisions companies dealing in mineral royalties, but the proposed change was not adopted, indicating that Congress did not intend to exclude oil and gas royalties other than royalties received by an operating company.

We are convinced that Congress in enacting the Federal Revenue Act of 1934, and our Legislature in enacting section 2(o) of the Personal Income Tax Act of 1935, understood fully the distinction between rents and royalties, particularly as applied to oil leases, and that they did not intend to exclude from the term ''royalties'' payments of a share of the product under oil leases which by common usage are known and referred to as ''royalties.''

Appellants cite several California cases which they assert hold that payments made to a lessor under an oil lease are not the purchase price of the oil in place but are compensation for the use of the land and are essentially rents. These cases are *Callahan* v. *Martin*, 3 Cal.2d 110 [43 P.2d 788, 101 A.L.R. 871] ; *Elsinore Oil Co.* v. *Signal Oil & Gas Co.*, 3 Cal.App.2d 570 [40 P.2d 523] ; *Barnard* v. *Jamison*, 78 Cal.App.2d 136 [177 P.2d 341]. However, these cases did not deal with tax matters or the statute here involved and are of little assistance in determining the issue here involved. While it may be true, as stated in *Callahan* v. *Martin, supra,* ''The royalty return which the lessee renders to his lessor for this estate in the land is rent, or so closely analogous to rent as to partake of the incidents thereof,'' we are satisfied the Congress intended to use the term ''royalties'' in the act here involved in its generally understood and ordinary everyday meaning.

In the case of *Logan Coal & Timber Assn.* v. *Commissioner,* the U. S. Board of Tax Appeals was called upon to decide if payments received by the Logan Coal Company which were based on the quantity of coal extracted from the land were royalties within the meaning of the Federal Revenue Acts of 1934 and 1936, as well as under the 1937 amendment to the personal holding company provisions of the revenue laws.

The board held (42 B.T.A. 529) that under the provisions of the Revenue Acts of 1934 and 1936 payments based on mineral production were royalties and not rents. The board pointed out that *Kiseau Petroleum Corp.* v. *Commissioner* (42 B.T.A. 69) specifically held that since the word "royalties" was used in its ordinary everyday sense meaning in the Revenue Act of 1934, it would include payments based on volume of mineral production. This decision was approved and affirmed by the Circuit Court of Appeals in 122 F.2d 848.

Appellants state that "While there is no question but that the language of the lease itself and by common usage payments under oil leases are referred to as 'royalties,' nevertheless, it should be noted that the lease uses the term synonymously with the term 'rent.' " The fact that the lease may use the term "royalties" synonymously with the term "rent" did not, of course, change the nature of the payments, nor could it have any effect upon the undoubted intention of Congress and the Legislature in the acts here involved to make such payments a part of the income of a personal holding company.

No other points raised require discussion.

In view of the foregoing we conclude that the payments received by the Monarch Investment Company under the oil and gas lease were "royalties" as that term was used in section 2(o) of the California Personal Income Tax Act of 1935 and that Monarch was a personal holding company.

The judgment is affirmed.

Adams, P. J., and Peek, J., concurred.